00001
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
     CIVIL ACTION NO. 17-CV-02893-STV
3    _____
4          DEPOSITION OF MICHAEL MALONE
                JUNE 6, 2018
5    _____
6    ANDREW DOORNBOS,
7         Plaintiff,
8    vs.
9    WINDTREE APARTMENTS, LLC, d/b/a
     WEIDNER INVESTMENT SERVICE, INC.,
10
          Defendant.
11   _____
12
13         Pursuant to Notice, the deposition of Michael
14   Malone was taken on behalf of the Plaintiff, pursuant
15   to the Colorado Rules of Civil Procedure, at the Law
16   Offices of Heuser & Heuser, L.L.P., 625 North Cascade
17   Avenue, Suite 300, Colorado Springs, Colorado, at
18   9:04 a.m., before Annette R. Trefz, Registered
19   Professional Reporter and Notary Public.
20
21
22
23
24
25
00002
1                APPEARANCES
2
3      FOR THE PLAINTIFF:
4         HEUSER & HEUSER, L.L.P.
            ATTORNEYS AT LAW
5          625 NORTH CASCADE AVENUE
            SUITE 300
6          COLORADO SPRINGS, CO 80903
7          BY: MR. DOUGLAS P. PRICE
8
       FOR THE DEFENDANT:
9
            GODFREY JOHNSON
10           ATTORNEYS AT LAW
            9557 SOUTH KINGSTON COURT
11           ENGLEWOOD, CO 80112
12           BY:  MR. AARON R. BAKKEN
13
       ALSO PRESENT:  Ms. Susan H. Brigham
14                Claims Manager
                Weidner Apartment Homes

Exhibit B

15
16
17
18
19
20
21
22
23
24
25
00003
1                    I N D E X
2
3   Witness         Examination         Re-Examination
4   MICHAEL MALONE
5      By Mr. Price      4
6
                   E X H I B I T S
7
                    INITIAL REFERENCE
8
     1 - Printed Color Photo (Windtree.00066)      48
9
     2 - Printed Color Photo (Windtree.00065)      50
10
     3 - Printed Color Photo (Windtree.00064)      51
11
     4 - Printed Color Photo (Windtree.00063)      52
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00004
1              WHEREUPON, the following proceedings
2   were had:
3              IT WAS STIPULATED AND AGREED the
4   within proceedings were taken pursuant to the
5   Colorado Rules of Civil Procedure.
6              WHEREUPON,
7                MICHAEL MALONE,
8   the witness herein, having been first duly sworn to
9   tell the truth, the whole truth, and nothing but the
10  truth, was examined and testified on examination as

11  follows:
12              EXAMINATION
13  BY MR. PRICE:
14     Q   Sir, can you tell us your name and spell
15  your last name.
16     A   My name is Michael Malone, M-A-L-O-N-E.
17     Q   And Mr. Malone, just some preliminary
18  matters.  I'm sure your counsel went through this
19  with you before we got started.
20          But dumb things like the court reporter
21  can't take head nods for answers, so you have to
22  answer yes or no.  Answer the question to the best of
23  your ability.  If you need to ask Counsel a question,
24  go ahead and answer first and then we can take a
25  break and you can step outside and ask the question
00005
1  afterwards to your counsel.
2          Any other questions before we get started?
3     A   No.
4     Q   All right, sounds good.
5          Have you ever had your deposition taken
6  before?
7     A   I have not.
8     Q   All right.  Now, this will be a first for
9  you.  My name is Doug Price.  I represent Andrew
10  Doornbos.  He's the plaintiff in this matter.  Do you
11  know him personally?
12     A   I've met him, yes.
13     Q   Okay.  And when did you first meet him?
14     A   I don't recall the exact date, but I know
15  that he was a resident at Windtree when I was working
16  there.
17     Q   Okay.  And speaking of Windtree, how long
18  have you worked for them?
19     A   So I've been with Windtree since -- I was
20  there starting in 2014.
21     Q   All right.  And at that particular complex,
22  is that what we're talking about, or do they all have
23  different names?
24     A   That would be particularly for Windtree is
25  in 2014.
00006
1     Q   And how was it that you came to work there?
2     A   So I started with Weidner in 2010.
3     Q   And that's Weidner Investment Services?
4     A   Correct.
5          MR. BAKKEN:  Can I step in real quick?
6          MR. PRICE:  Sure.
7          MR. BAKKEN:  Can you tell him the name of
8  your employer?  It's not Weidner Investment Services,
9  is it?
10         THE WITNESS:  It would be Weidner Property
11  Management.
12         MR. BAKKEN:  Thank you.

13 BY MR. PRICE:
14    Q    And so is Weidner Property Management and
15 Windtree, are they two different organizations?
16    A    I'm not sure of the specifics of how that
17 works out.  I know that Windtree would be separate
18 from -- would be an individual from Weidner Property
19 Management.
20    Q    Okay.  So who are you paid by?
21    A    I'm paid by Weidner Property Management.
22    Q    And where is their business office?
23    A    They have a regional office here in
24 Colorado Springs.
25    Q    Okay.  And you say you've been with them
00007
1 since 2010?
2    A    Correct.
3    Q    What did you start with them as?
4    A    I started as an intern with them.
5    Q    Okay.  And let's go back to your
6 educational background.  Where did you grow up?
7    A    I was born in Taiwan.
8    Q    All right.  Military family?
9    A    My dad was a minister.
10    Q    Oh, okay.  And what brought you to Colorado
11 Springs?
12    A    When I graduated from college, my family
13 was living out here, and I was looking for
14 employment, and I got a job with Weidner.
15    Q    All right.  What did you study in college?
16    A    My degree is in communication studies.
17    Q    And what year did you graduate?
18    A    I graduated in 2010.
19    Q    Okay.  And what university?
20    A    It's called Eastern University, in
21 southeastern Pennsylvania.
22    Q    What town?
23    A    St. David's, Pennsylvania.
24    Q    All right.  And what made you choose
25 Weidner Investment Properties for an employer?
00008
1    A    I saw an advertisement for their open
2 position, and I liked the ability to deal with
3 customers and interact with people and kind of a
4 multifaceted job.
5    Q    All right.  What did you originally start
6 doing for them besides being -- I guess you said you
7 started as an intern, but what did that entail?
8    A    So that was just assisting and kind of
9 observing with the community director on site what it
10 looked like, what the field of property management
11 looked like.
12    Q    So that was the carrot that you were going
13 after, was to become a property manager; is that
14 right?

15    A    Correct.
16    Q    Okay.  When did you become a property
17 manager?
18    A    So I started as a property manager a year
19 later, 2011.
20    Q    Okay.  And what property did you start
21 with?
22    A    It was called Bristol Square.
23    Q    Is that also in Colorado Springs?
24    A    Correct.
25    Q    And so as a property manager, do you live
00009
1  on site or what do you do?
2     A    I do not live on site, no.
3     Q    Okay.  So is it like an 8-to-5 job?  Or
4  give me your description when you started at Bristol
5  Square what it was like.
6     A    Bristol Square, my hours were between 9 and
7  6, just kind of standard hours for that.  And really,
8  I'm just, you know, I'm trying to build a community
9  with the people there, so I'm working with the team
10 to provide homes for those people there.
11    Q    Okay.  So are you background screening
12 people and doing all those kinds of things?
13    A    Yeah.
14    Q    Give me a basic --
15    A    So we would do all the -- we would be, you
16 know -- we would screen residents who were prospects
17 interested in living there.  We would deal with
18 residents to try to make the best experience for them
19 while they were there.  If they were dealing with any
20 maintenance issues, we would take care of all of
21 that.
22    Q    Okay.  So Weidner is probably the company
23 that's responsible for all the on-site maintenance,
24 or do you subcontract that out?
25    A    So we would do -- most all the maintenance
00010
1  we would do in-house.  Maybe some larger or bigger
2  project items we would subcontract out, but most
3  everything is done in-house.
4     Q    Okay.  So is Weidner then solely dedicated
5  to all the Windtree, the Bristol Square, all the
6  apartment complexes?
7     A    Yes.
8     Q    And how many apartment complexes are there
9  in Colorado Springs?
10    A    I believe there is about 18.
11    Q    Okay.  And those 18 complexes, who are they
12 owned by?
13    A    I'm not sure of the particular owners of
14 each of those.
15    Q    All right.  Are they individually owned or
16 all owned under one corporate shell?

17     A   I'm not sure on the particulars of their
18 structure of the ownership.
19     Q   Okay.  And so then who do you report to, in
20 terms of Weidner?  Who do you report to?  Who's your
21 supervisor?
22     A   So during my time currently?
23     Q   No, back in December of 2000 and -- at the
24 time this incident occurred.
25     A   So I reported to an area director.
00011
1     Q   Okay.  Who was that?
2     A   The area director, her name was Lauriza
3 Dishion.
4     Q   Okay.  And do you know who Laurie Dishion
5 -- is that how you say it?
6     A   Lauriza Dishion.
7     Q   I have it spelled D-I-S-H-I-O-N; is that
8 right?
9     A   Correct.
10     Q   Okay.  Who does she report to?
11     A   She would report to the regional vice
12 president.
13     Q   Okay.  Who is?
14     A   Robert Carr.
15     Q   All right.  And are they all local, then,
16 in Colorado?
17     A   Yes, they're in Colorado Springs.
18     Q   Okay.  So with regard to reporting to them,
19 what kind of training, during that internship
20 training, did they give you to become a property
21 manager?
22     A   So they had a really great training
23 program.  So from the internship, I was part of their
24 Manager In Training Program, so that was a 12-month
25 process of, you know, learning what it takes to --
00012
1 being on-site, learning what it takes to run a
2 property well, and had monthly curriculum I had to
3 get through and tests to pass to be certified to be
4 able to run my own community.
5     Q   When you say "certified," what kind of
6 certification do you get?
7     A   So specifically just the certification of
8 passing that Manager In Training Program.
9     Q   That's only Weidner specific; is that
10 right?
11     A   Correct.  Yes.
12     Q   All right.  Did they send you to seminars,
13 did they, you know --
14     A   Yeah, we have a Training Department
15 in-house that they'll do monthly trainings, either in
16 person or online, where we would go through best
17 practices or policies and procedures of how to
18 operate.

19      And then also I would get certifications
20  through the National Apartment Association, which
21  there's designations through that. So Certified
22  Apartment Manager would be a designation that I would
23  hold, as well.
24      Q   When did you obtain that?
25      A   I obtained that in, I believe it was the
00013
1  beginning of 2014.
2      Q   All right. Do you have anybody that lives
3  -- and when I say do "you," I'm referring to
4  Weidner. Do they have anybody that lives on-site as
5  a manager?
6      A   Yeah. Sometimes we do, yeah.
7      Q   But at Windtree, in terms of this case,
8  there was nobody living on-site?
9      A   So I lived at Windtree for a period of
10  time, but during this time I don't believe that I was
11  living there.
12      Q   All right. So your position on the date of
13  this incident back in December of 2000 -- I'm
14  spacing. Do we have it on here -- December 18th,
15  2015, you were actually the manager for the apartment
16  complex, right?
17      A   Correct.
18      Q   All right. And who did you have working
19  underneath you?
20      A   The whole team that I had?
21      Q   Right.
22      A   So in the office, I have an assistant
23  community director and leasing consultant. And then
24  our service side, we had a service manager, a service
25  technician, housekeeper and groundskeeper.
00014
1      Q   All right. Who's the groundskeeper?
2      A   Groundskeeper? The name of the
3  groundskeeper?
4      Q   Correct.
5      A   It would have been Jason Punzal.
6      Q   And do you know where Mr. Punzal is now?
7      A   I do not.
8      Q   Was Mr. Punzal there before you started or
9  did you hire him?
10      A   I hired him.
11      Q   All right. And tell me why you hired Mr.
12  Punzal.
13      A   So we have positions for -- set positions
14  for each community that we need to fill, and so one
15  of the needs of our community was to ensure that our
16  grounds look clean and fresh and it's a pleasant
17  community for our residents to live in.
18      Q   Okay. And what were his duties?
19      A   So his duties are to walk the grounds, make
20  sure everything is clean, picked up, landscaping is

21    groomed, make sure everything is in order on the
22    exterior of the community.
23        Q    Okay.  So would he be in charge, then, of
24    like, you know, if there were major problems with the
25    sprinkler system, would he be in charge of fixing
00015
1    that?
2        A    He would not be in charge of that.  He's
3    more of the eyes on-site for me.  If he saw anything
4    that he thought was a concern, he would communicate
5    that to me or to our service manager Jeff Cox, and
6    then we would deal with it accordingly.
7        Q    Okay.  And so when you say "deal with it
8    accordingly," are we talking about you'd hire
9    subcontractors to do it or would Weidner have other
10    people that would come in and do it?  It probably
11    depends on the circumstance, but --
12        A    Correct, yeah, it depends on the
13    circumstance.  If it's something minor, then we can
14    do that in-house.  If it's something bigger, a more
15    technical issue, then we would contract it out.
16        Q    Okay.  So specifically on this date, going
17    back to December of 2015, were we -- I say "we" --
18    was Weidner subcontracting out snow removal or did
19    you have your own snow removal business?
20        A    So for our sidewalks, stairwells, we would
21    do that in-house, to remove the snow, and then we
22    also have a Landscaping Department and they would
23    have done the snow plows in the parking lot, so they
24    would remove the snow.
25        Q    So Weidner would have done all that and
00016
1    been responsible for it?
2        A    They would have cleared the parking lots.
3        Q    That's part of your contractual agreement
4    with Windtree?
5        A    I don't understand.
6        Q    Well, as part of being the property
7    manager, you contract with them for snow removal,
8    correct?
9        A    Correct, yes.
10        Q    Okay.  And so in terms of that in December
11    of 2015, Weidner would have been the responsible
12    party for making sure the snow removal was conducted
13    and Ice Melt and those kinds of things?
14        A    Correct.
15        Q    All right.  How did you go about angering
16    those services?
17        A    So for the -- in terms of the snow removal
18    for the parking lots, that's something we would do as
19    a region, and our regional team would make those
20    decisions, in terms of the contracts that we had and
21    who would be assigned to remove the -- take care of
22    the snow.

23    Q    So, obviously, at that point you lived in
24  Colorado Springs for about five years; you're
25  familiar with, you know, how big it is in terms of
 00017
 1   the size of the city, correct?
 2    A    Yes.
 3    Q    And, you know, sometimes some parts of the
 4  city gets hit with snow and other parts doesn't get
 5  any at all, correct?
 6    A    Correct.
 7    Q    All right.  Who makes the decision, in this
 8  case, when Windtree gets snow removal?
 9    A    So we have clear policies and procedures of
10  when we would be out on-site to remove snow.  So if
11  there's over an inch of snow on our sidewalks,
12  stairwells, then if that would be overnight, then the
13  next morning, 6:30 a.m., we would be out to remove
14  that snow.
15        If there's more than 3 inches of snow in
16  the parking lots, that's when we would be out to --
17  that's when we would be out to plow.
18    Q    So who makes the call on that?
19    A    So myself and Jeff, my service manager,
20  would be the ones that make that call to determine
21  when we come out.
22    Q    Jeff Cox, is that who you're talking about?
23    A    Yes.
24    Q    And so let's say it snows overnight and you
25  have, you know, snow still during the morning and
 00018
 1   it's starting to accumulate and it's hit the whole
 2  city; is it Weidner, then, that has a team that shows
 3  up, or are you and Jeff and the whole staff there at
 4  Windtree out doing the work?
 5    A    Yeah, it would be our whole team.  So many
 6  times, I would actually be one of the people out
 7  there shoveling the snow and removing the snow, just
 8  so that we could do it in a timely manner and take
 9  care of our residents.
10    Q    All right.  So in terms of policy and
11  procedures, you spoke about those things, are those
12  written policies and procedures?
13    A    Yes, I believe so.
14    Q    And where are they contained?
15    A    I think our policy and procedure handbook,
16  our regional office would have that.
17    Q    Is that something that could be made
18  available to us, in terms of discovery in this case?
19    A    I believe so.
20    Q    All right.  You wouldn't have any problem
21  turning that over?
22    A    No.
23    Q    Okay.  And so you had that actual policy
24  and procedure manual in place and were following it

25  in December of 2015?
00019
1     A    Correct.
2     Q    All right.  Tell me about, you know, what
3  your duties are in terms of weather.  And we've got
4  some disclosures in terms of procedures that you have
5  for a calendar where you take notes of what's going
6  on that day.  Who does that?
7     A    So primarily, that would be our service
8  manager that completes the snow calendar.  Obviously,
9  I'm working with him closely to ensure that we are
10  completing that accurately, so if he's not able to do
11  that, I would assist in that, as well.
12    Q    So back in December of 2015, who would that
13  have been?
14    A    It would have been Jeff Cox.
15    Q    So he would have been responsible for the
16  snow calendar.  Does he take temperature readings,
17  also?
18    A    So he wouldn't take the temperature
19  readings; we would use the forecast for the day.
20    Q    All right.  And so when is that done,
21  then?  When does he fill that calendar out?
22    A    So that would be on a daily basis.  And
23  then if we were going to do snow removal that day, he
24  would complete that after we have completed the snow
25  removal.
00020
1     Q    So we're talking about the end of his day
2  and end of snow removal might be what time?
3     A    His standard work hours is through 5 p.m.,
4  but if we were out in the morning shoveling snow, it
5  would probably be done by 9, 9 or 10 a.m.
6     Q    Okay.  So that's his responsibility to
7  follow-up and make sure that that's filled out on a
8  daily basis?
9     A    Correct.
10    Q    And where does he keep that calendar?
11    A    That would be in our maintenance shop.
12    Q    All right.  And do you regularly follow-up
13  to make sure that he's doing that?
14    A    Yes.
15    Q    And back in December of 2015, were you
16  doing that?
17    A    Yes.
18    Q    All right.  And are you aware of whether or
19  not in December of 2015 he was accurately keeping
20  track of that?
21    A    I believe he was, yes.
22    Q    Okay.  So I think we got a calendar from
23  you.  I don't know if I brought it over on not.  I
24  just want to make sure it's the same one.
25         You know, I don't think we're going to mark
00021

1  it, because I'm not going to use it, but is this the
2  calendar that you've been talking about?
3      A   Yes.
4      Q   Okay. And so the handwriting, in terms of
5  this calendar, is Mr. Cox; is that correct?
6      A   Yes, I believe so.
7      Q   All right, thank you. And so who makes the
8  determination in terms of what kind of snow melt you
9  guys use?
10     A   So for our sidewalks, we'll have an Ice
11 Melt that we use. So once we remove the snow from
12 the sidewalks and stairs, then we'll put an Ice Melt
13 down.
14     Q   Okay. Who buys that?
15     A   Me and Jeff would buy that from one of our
16 suppliers.
17     Q   All right. And is there different grades,
18 different temperatures, those kinds of things?
19     A   Honestly, I'm not sure of the specifics of
20 the differences.
21     Q   Jeff would know that?
22     A   He might, yes.
23     Q   Okay. So that's not something you received
24 from corporate, from Weidner, it's something that you
25 and Jeff buy?
   00022
1      A   So they have a -- I mean, we usually buy in
2  bulk with our communities, so there would be a set
3  type that they would want to purchase.
4      Q   Okay. And let's talk about the parking
5  lot. When you have the parking lots done, you say
6  you need 3 inches of snow before the plows come out;
7  is that right?
8      A   That's when we would definitely be out.
9      Q   All right. What kind of -- it's not really
10 snow melt. Do they just scrape the road?
11     A   So we would scrape the road with a plow and
12 then add sand, a mixture, to the parking lot, as
13 well, for traction.
14     Q   Okay. And how do you ensure that the sand
15 -- what spots get sanded?
16     A   So I believe that we would just -- we would
17 put sand throughout the whole parking lot and through
18 all the driveways.
19     Q   All right. Obviously, on the date that
20 this happened, this incident, there was still some
21 ice and slush in the parking lot.
22         Do you recall that?
23     A   I remember the incident, yes.
24     Q   Okay. Do you recall the parking lot area
25 where this occurred?
   00023
1      A   Yes, I do.
2      Q   Okay. Was there some ice and slush and

3  things like that in the parking lot area?
4      A   Yes, I did see some slush there.
5      Q   Okay.  And with regard to that, when was
6  the last time sand had been put down?
7      A   I'm not sure of the specific time when it
8  was done.
9      Q   So was it done that day or was it done that
10  week or do you know?
11     A   It would have been done -- my guess is it
12  would have been done earlier in the week.
13     Q   All right.  Who makes the determination
14  whether or not it's good enough, in terms of the
15  scrape off job they've done for the plows; who makes
16  that call?
17     A   So they would come out and they would
18  remove the snow, and then if myself -- if I saw an
19  area that I thought needed extra attention, then we
20  could notify them to come out again to --
21     Q   And then --
22     A   -- do another pass.
23     Q   I'm sorry I talked over you.  I apologize.
24  Go ahead.
25     A   So, I mean, if we saw an area that needed
  00024
1  extra attention, then we would call them out to come
2  through again, if needed.
3      Q   Do you ever have to do that?
4      A   I believe I have done that, yes.
5      Q   So it's not costing Weidner any more money
6  if you have to send out a truck to come around again,
7  correct?
8      A   Well, it's absolutely costing us more
9  money.  More time to send somebody out and do more
10  work would cost us more.
11     Q   Okay.  But they're employees of Weidner,
12  correct?
13     A   Correct.
14     Q   All right.  So it's not like you're
15  bringing out a subcontractor twice to do the same
16  job?
17     A   No.
18     Q   There's somebody that works for your
19  company?
20     A   Correct.  But I'm still going to be billed
21  for the work that they come out to do.
22     Q   When you say you're going to be billed,
23  what do you mean?
24     A   Because I'm paying for that work.  Even
25  though they're within our -- we're paying for that
  00025
1  specific work that's happening on the property.
2      Q   I'm sorry, can you expand on that a little
3  bit for me?
4      A   So they work for Weidner Property

5   Management, but they're doing work specifically on my
6   community, so we need to allocate where they're
7   spending their time and their resources.
8        So if one of our communities is spending
9   more resources, then we're going to be charged
10  according to that work.
11     Q   Okay, makes sense.
12        The same with Ice Melt and things like
13  that; does it come -- you know, is that something
14  that's charged to your specific site?
15     A   The Ice Melt?  Yeah, I would pay for my
16  particular site.
17     Q   Dumb question, but have you ever had any
18  write-ups because you're using too much Ice Melt or
19  calling out the snow removal trucks too much?
20     A   I have not, no.
21     Q   All right.  So I think, what I've
22  understood through disclosures -- those are the
23  reports that we get back from Counsel -- you found
24  out on the date of this incident, on December 18th,
25  2015, that Mr. Doornbos had fallen; is that correct?
   00026
1      A   Correct.
2      Q   And who did you receive that notice from?
3      A   I believe it was one of the residents that
4   came into the office that informed me of an ambulance
5   on-site.
6      Q   Okay.  And did you go out?  What did you
7   do?
8      A   So, yeah, anything -- if there's anything
9   like that, I want to ensure the safety and make sure
10  and see what's going on at our community, so I,
11  myself, went out to check to see if I could be of any
12  assistance.
13     Q   Okay.  Tell me your recollection of what
14  you remember that day.
15     A   So when I walked out, I saw an ambulance
16  parked up and I saw Mr. Doornbos on a stretcher being
17  put into the ambulance.
18     Q   How far was your office from where he was?
19     A   I don't know the specifics of it.  A couple
20  buildings away, though, from there.
21     Q   Okay.  What were the weather conditions
22  like, do you know?
23     A   I remember it being cold, but the skies
24  were clear, a little overcast.
25     Q   And I think the temperatures for that date
   00027
1   were noted.  We're talking about, I want to make
2   sure, 51 and 24; does that sound accurate?
3      A   That sounds accurate, yes.
4      Q   Okay.  What were the parking lot conditions
5   like at that point?
6      A   From what I observed, we had completed some

7  snow removal.  You can see that we had removed it
8  from the parking lots, and there's snow on -- kind of
9  out of the way there.  But overall, I think the
10  conditions were pretty good.
11     Q   Okay.  And do you know, just off the top of
12  your head, how long ago the snow removal had been
13  done?
14     A   I do not know.
15     Q   All right.  And who would know that?
16     A   Whoever was doing our landscaping, was
17  doing the plow, would have a better idea of that.
18     Q   Okay.  And, obviously, that might be a
19  better question, would you agree, for Mr. Cox?
20     A   Yes.
21     Q   All right.  Super.
22         So Bristol was your first assignment,
23  correct?
24     A   Correct.
25     Q   Did you go to any other buildings besides
   00028
1  Bristol and Windtree?
2     A   Yes.
3     Q   And where were you before that?
4     A   So after Bristol Square, I was at Broadmoor
5  Park Tower and Terrace, and after that I was at
6  Eagleridge.
7     Q   And those are all in Colorado Springs?
8     A   Correct.
9     Q   All right.  And you still work for Weidner,
10  correct?
11     A   Yes.
12     Q   All right.  So, you know, I think Harry
13  Truman had the sign that said, The buck stops here,
14  on his desk.  You're familiar with who Harry Truman
15  was; he was president?
16     A   Yes.
17     Q   Are you familiar with that?
18         So in terms of that sign, is that sign
19  technically on your desk?  Are you the last person,
20  in terms of this chain of command, for a slip and
21  fall?
22     A   So, I mean, I'm responsible for the
23  operations of the community, but honestly, I work
24  very closely with our regional team.  So the area
25  director has a big part in what goes on on-site, as
   00029
1  well.
2     Q   And the name of that regional director,
3  again, is that --
4     A   Lauriza Dishion.
5     Q   All right.  Was she made aware of this
6  incident?
7     A   Yes.
8     Q   Okay.  And that's through the internal

9  report that we've gotten a copy of, right?

10    A    Correct.

11    Q    All right.  What is her responsibility with

12  it after that?

13    A    I mean, we work -- She's made aware of it

14  because we don't want incidents like this to happen.

15    Q    Right.

16    A    So we figure out what happened and if

17  there's anything we can do to help that resident.

18    Q    Did she come out and visit the site?

19    A    Yes, I believe so.

20    Q    All right.  And when did she do that?

21    A    I don't know the specific date.

22    Q    Do you have any idea; could you guess?

23    A    I'm not sure.  I mean, she was there

24  multiple times a week.

25    Q    Oh, really?

00030

1     A    Yes, absolutely.

2     Q    And why?

3     A    Because she works with me closely to make

4  sure the property is running smoothly.

5     Q    So she's kind of like a floater that

6  oversees everybody?

7     A    Correct.

8     Q    So she's out there.  And what's her

9  responsibility when she comes out to your property?

10    A    Her responsibility is to make sure that

11  we're doing -- we're working, we're doing our work.

12    Q    You're at the job, right?

13    A    Yeah.

14    Q    Okay.  And so is she out there picking up

15  new applications, is she -- I guess I'm trying to get

16  a better handle on what she's doing.

17    A    So she's not usually doing applications

18  but, I mean, she would come in and help do whatever

19  we needed.  But she works with me closely to make

20  sure that we're performing properly.

21    Q    Part of that performing properly is making

22  sure all the units are rented and the customers are

23  happy, correct?

24    A    That's correct; yes.

25    Q    All right.  So who supervisors the parking,

00031

1  where people park and things such as that?  Is that

2  part of the contract that the resident signs or is

3  it, you know -- tell me more about that.

4     A    So at Windtree, every apartment home comes

5  with one covered carport, and that's assigned to

6  their parking.  Then we do have uncovered lot spaces

7  throughout the community that are unassigned.

8     Q    Okay.  And if I get this right, it still is

9  a private area, though, correct?

10    A    It's private property, yes.

11   Q   So the public can't park there, it's just
12 the residents that can park there?
13   A   The residents and their guests can park
14 there.
15   Q   And how many vehicles are allowed for the
16 residents to park there?
17   A   We wouldn't have specifics of how many
18 vehicles they would have.
19   Q   So there is no specifics?
20   A   It wouldn't be a specific, no.  I mean,
21 they're allowed to have that one in the carport, and
22 then there's some people that would have three cars,
23 two cars, it just depends.
24   Q   Do you get a sticker or what designates a
25 person as a resident being there versus, let's say, a
  00032
1 visitor?
2   A   There wouldn't be a distinction of a
3 sticker.  We would keep track of the carports, and
4 their lease agreement would show what space they're
5 assigned to.
6   Q   Okay.  But let's say you had somebody that
7 had somebody come and stay as a guest of one of the
8 residents and parked their car for three or four
9 weeks there.  Would that be allowable?
10   A   We're always around walking through the
11 community to see -- make sure everything is in order,
12 so if we did see a vehicle that was there for an
13 extended period of time or was not in good shape,
14 then we would put a note on the vehicle to figure out
15 what was going on.
16   Q   All right.  Were you familiar with Mr.
17 Doornbos's vehicles?
18   A   No.
19   Q   Okay.  So at the time when you went out to
20 look at the parking lot, you didn't happen to know
21 whether or not his vehicles were in the lot?
22   A   No.
23   Q   All right.  Who's Dustin Halcomb?
24   A   Dustin is our regional maintenance
25 supervisor.
  00033
1   Q   Okay.  And what's his job function, to the
2 best of your knowledge?
3   A   So he oversees all of our maintenance
4 operations in Colorado Springs, just to ensure that
5 we're being as efficient as possible and help
6 technicians troubleshoot any concerns that arise.
7   Q   Okay.  So with regard to his
8 responsibilities back in December of 2015, you would
9 say he was in charge of what?
10   A   In 2015?
11   Q   Yes.
12   A   He would have the same duty, so he would be

13  in charge of the maintenance operations for our
14  communities.
15      Q    So he's one of the people that would be
16  responsible for making sure that the snow plows went
17  through?
18      A    Yes, he would assist in that.
19      Q    All right.  But the purchase of the Ice
20  Melt, that's your responsibility?
21      A    Correct.
22      Q    And then the trucks that come through and
23  plow, describe those for me, because there's a whole
24  bunch of different kinds of vehicles that do that.
25  What was Weidner using at that time?
 00034
1       A    So it was a Chevy pickup truck with a plow
2   on the front.
3       Q    All right.  And how did the sand get spread
4   out?
5       A    Then they have a spreader in the bed of the
6   truck.
7       Q    So something that they load up with; is it
8   gravel, is it walnut, is it sand?  What is it?
9       A    I believe it's a sand mixture.  And they
10  have a device that will spread it as they drive
11  through.
12      Q    So it's a sand mixture.  What else does it
13  have in it?
14      A    I don't know the specifics of what's in it.
15      Q    Who would know that?
16      A    Dustin would probably know that, yes.
17      Q    I guess what I'm trying to figure out is
18  when you've got temperatures that are dipping down in
19  the teens at night, is there anything in that sand
20  mixture that helps to break it up and keep it from
21  refreezing?
22      A    I'm not sure.
23      Q    Okay.  So Mr. Dunbar is the one that -- is
24  he the person in charge of hiring the people to drive
25  the trucks to come out to do the work?
 00035
1       A    It would have been Mr. Dunbar and another
2   associate that would have been in the trucks.
3       Q    So Mr. Dunbar, himself, actually comes out
4   and does this?
5       A    Correct.
6       Q    All right.  And was he employed with
7   Weidner back in December of 2015?
8       A    Yes.
9       Q    All right.  What is Cherish Rosales -- if
10  I'm saying her name correctly, C-H-E-R-I-S-H,
11  Rosales, R-O-S-A-L-E-S?
12      A    The first name is pronounced Cherish.
13      Q    Cherish?  Okay.  What's her responsibility?
14      A    She was the assistant community director.

15    Q    Okay.  So did she work directly under you?

16    A    Yes.

17    Q    Okay.  And is she still with the company?

18    A    She is not.

19    Q    Okay.  Do you know where she is now?

20    A    Yes.

21    Q    Where is she?

22    A    She works at Whispering Hills.

23    Q    In Colorado Springs?

24    A    Yes.

25    Q    Is that another organization?

00036

1    A    Correct.

2    Q    Okay.  Jonathan Landa, L-A-N-D-A, who is

3  he?

4    A    He was the leasing consultant.

5    Q    And what was his job?

6    A    I mean, we all work as a team in the

7  office, but specifically for the leasing consultant

8  they, you know, assist in resident relations making

9  sure everybody is taken care of and comfortable at

10  their home, and then also helping with new prospects

11  that come in and renting out apartment homes.

12    Q    Did those folks ever have to come out and

13  shovel snow or put down Ice Melt?

14    A    Sometimes they would assist, yes.

15    Q    Okay.  Were they employed there in December

16  of 2015?

17    A    Yes.

18    Q    Christian Curlington, do you remember that

19  name?

20    A    Yes.

21    Q    And who is that?

22    A    He was a service technician.

23    Q    What does that mean?

24    A    So a service technician reports to the

25  service manager, and he would assist in making units

00037

1  ready for move-in and then completing service

2  requests in occupied apartments.

3    Q    So if the fluorescent lights were out, he'd

4  be one of the people doing that?

5    A    Correct, yes.

6    Q    So his responsibility wasn't so much snow

7  removal or anything like that?

8    A    No, he would assist in snow removal, as

9  well.

10    Q    Okay.  Maria Sayer, she was a housekeeper;

11  is that right?

12    A    Correct.

13    Q    Is she still with you folks?

14    A    Yes.

15    Q    And Mr. Curlington, is he still with you

16  folks?

17    A   No.
18    Q   Do you know where he is?
19    A   I do not.
20    Q   And, obviously, Mr. Punzal, he was the
21   groundskeeper and he's left.  When did he leave?
22    A   I don't remember.
23    Q   Do you know the circumstances of him
24   leaving?  Was he fired or did he just relocate?
25    A   I'm not sure.
 00038
1     Q   And why?  Why aren't you sure?
2     A   From Windtree, he worked at a different
3   community in Colorado Springs, so I'm not sure what
4   happened after that.
5     Q   So a different community within Weidner
6   Investments and he went over there instead, correct?
7     A   Correct.
8     Q   And then he left?
9     A   Yes.
10    Q   All right.  Who replaced Mr. Punzal?
11    A   I believe it was Elias, last name was --
12   I'm not sure how to pronounce it, but it would be
13   S-A-L-L-E.
14    Q   How long did Mr. Punzal stay with you folks
15   after the December of 2015 incident?
16    A   I'm not sure.
17    Q   Okay.  I don't know, have you seen a
18   picture in which there's somebody out with a snow
19   shovel in one of the parking lots?
20    A   Yes.
21    Q   And is that Mr. Punzal in that picture?
22    A   I believe so, yes.
23    Q   And why is he out in the parking lot with a
24   snow shovel?
25    A   So if we see areas that need special
 00039
1   attention or concerns that we have on-site, if it's
2   something we can take care of immediately, we'll have
3   somebody on our team take care of that.
4     Q   Okay, I got you.  And with regard to this
5   particular property, you have certain areas that are
6   shady areas during times of the day and refreeze; is
7   that correct?
8     A   Yeah, there's parts that are shaded or the
9   sun's going up in a different spot.
10    Q   You can't do it all.  And would you agree
11   that, I mean, you're just going to have natural
12   melt-off?
13    A   Yeah, we live in Colorado, so there's a
14   freeze and thaw.
15    Q   Gotcha.  Would you agree with me that when
16   you went out on the date of December -- I want to
17   make sure I get this right -- December 18, 2015, that
18   there was still slush and ice and things like that

19 present in the parking lot?
20   A   Yes, I did notice that.
21   Q   All right. And did you have to be careful
22 in terms of where you were stepping, things such as
23 that?
24   A   I mean, I don't remember specifics, but I'm
25 always careful when I'm out walking around,
 00040
1 especially in the winter of Colorado.
2   Q   Sure.
3       And on the day of December 18th, 2015, had
4 you been out specifically that day and walked the
5 property?
6   A   I believe so. Every day I'm out walking
7 the property, so I'm sure I was out that day at some
8 point.
9   Q   All right. And when you say you go out and
10 you walk the property, do you walk the entire
11 property?
12   A   It depends on the day. A lot of times I'll
13 walk our apartments that are made ready that we're
14 going to be showing to prospects for the day, so I
15 don't necessarily get to the whole property every
16 day, but I do try to get out as much as possible.
17   Q   Do you folks employ security guards there?
18   A   We do have a courtesy patrol that would
19 come through in the evenings.
20   Q   But there isn't like a guarded gatehouse or
21 anything like that?
22   A   No.
23   Q   And nobody that goes out and walks the
24 grounds?
25   A   No.
 00041
1   Q   All right. And describe for me the setup
2 of the apartments. Are they all outside entrances?
3   A   Yes, they're all outside entrances.
4   Q   Okay. To the best of your knowledge, when
5 did the snow that we see in some of these pictures,
6 when did that come out? I mean, when do you recall
7 the date of the storm that brought that snow?
8   A   I'm not sure. I think it was earlier in
9 the week, but I don't know.
10   Q   All right. Do you know whether or not --
11 that picture of Mr. Punzal, do you know when that was
12 taken?
13   A   I do not know.
14   Q   Do you know when before the date of this
15 incident, so December 18th, 2015, when had he last
16 been out working in the parking lot?
17   A   I'm not sure. I don't recall.
18   Q   Okay. Do you keep records of those things?
19   A   The only records we have is in terms of the
20 snow calendar we were talking about earlier.

21    Q    Who makes the determination where to send
22 Mr. Punzal, in terms of going out and shoveling snow,
23 doing things like that?
24    A    That would be myself and the service
25 manager.
  00042
1    Q    So Mr. Cox?
2    A    Uh-huh.  Yes.
3    Q    So a follow-up question to that.  Do you
4 know who made the last inspection of the parking lot
5 before Mr. Doornbos fell?
6    A    I do not know.
7    Q    All right.  According to your records, when
8 would have been the last time somebody would have
9 been out there walking through the parking lot or
10 something like that?
11    A    So we would have come out right after the
12 initial snow and we would have done the Ice Melt, and
13 then the following day we would have gone out again
14 and checked to make sure that everything was cleared
15 appropriately.
16    Q    And that's just for the sidewalks, correct?
17    A    That would be for the sidewalks, yes, but
18 we would observe the rest of the community, too, to
19 ensure that everything else looked good.
20    Q    But the only time you'd call out the trucks
21 with the sand would be 3 inches or more, correct?
22    A    So yeah, I mean, we would do 3 inches or
23 more.  Obviously, if the conditions were worse and we
24 needed them out sooner than that, we would call them
25 and have them remove the snow as needed.
  00043
1    Q    It's rare that we ever get ice storms in
2 Colorado, but in those circumstances, have you ever
3 had the trucks come out and just throw sand?
4    A    Yes, I have.
5    Q    Was that done, at all, in those days prior
6 to this, prior to the incident of December 18, 2015?
7    A    I know that sand was put down in the
8 parking lot after they had plowed.
9    Q    Okay.  Dumb question; how's the sand get
10 picked up?
11    A    I mean, there's nothing that picks it up.
12 I think in the -- we'll do a cleanup in the spring
13 and clean the curbs, but it's going to be in the
14 parking lot, or there's going to be washout from the
15 rain.
16    Q    Gotcha.  Once the incident happened, Mr.
17 Doornbos had fallen, the ambulance, did the fire
18 department come?
19    A    Yes.
20    Q    All right.  What kind of, you know -- what
21 was your responsibility after you received notice of
22 that?

23     A    After I received notice of what?

24     Q    Of him falling.

25     A    So like I said before, I went out there,

00044

1   and I don't believe I spoke to Mr. Doornbos, but I

2   did speak with his spouse and say, Please let me know

3   if there's anything else we can do to help you and

4   assist in anything.

5     Q    Okay.

6     A    And then, obviously, if somebody slips in

7   an area, we want to make sure that doesn't happen

8   again, so we would go and make sure that either the

9   plow comes out again or we remove that, as needed.

10    Q    Okay.  And with regard to this incident,

11  you said you did speak to his spouse.  Is that Terry

12  Duffy; is that her name?

13    A    Yes.

14    Q    And she was there on scene with him?

15    A    Yes.

16    Q    Obviously, the concern was that he'd broken

17  something and that he was going to go to the

18  hospital, correct?

19    A    Correct.

20    Q    So how long was your conversation with her?

21    A    It was very short.  I mean, obviously, it's

22  a very stressful situation, so I just wanted them to

23  know that I was there to help them if they needed,

24  and then they left in the ambulance.

25    Q    Okay.  So after everybody clears out, what

00045

1   did you do?

2     A    After everything was done?

3     Q    Right.  And I guess what I'm saying, so

4   this happened somewhere around 4:00; is that your

5   recollection?

6     A    I believe so.

7     Q    What did you do after that?

8     A    So after that, I contacted my area director

9   just to let her know what's going on.

10    Q    And that's?

11    A    That's Lauriza Dishion.

12    Q    Okay, sorry.  So you contacted her.  Was

13  that a phone call, an email?  What did you do?

14    A    That was a phone call.

15    Q    All right.  And what was her instructions,

16  then, to you?

17    A    Her instructions were for me to just make

18  sure that the area was secure, and that if there was

19  anything we needed to do to remove any snow or ice

20  that was on the parking lot, that we should do that.

21    Q    Okay.  So this is now 4:15, 4:30, roughly?

22    A    Uh-huh.

23    Q    Did you or any of your folks go out and

24  start shoveling snow out of the parking lot, or what

25 happened?
00046
1     A    I believe our maintenance team was out
2 after that to make sure that it was --
3     Q    Who was?
4     A    The maintenance team.
5     Q    Okay.  And who would that have been; Mr.
6 Cox?
7     A    I don't remember who it was specifically,
8 no.
9     Q    Okay.  And did they shovel that particular
10 area where Mr. Doornbos had fallen?
11    A    I don't know for certain.
12    Q    Would that have been a concern of yours,
13 though?
14    A    The only thing I remember would be them
15 putting down Ice Melt there in that area.
16    Q    So somebody would have gone out then with
17 Ice Melt and thrown it in that particular area?
18    A    Correct.
19    Q    Okay.  So we're not talking sidewalks or
20 anything like that, we're talking about throwing it
21 into the actual parking lot street asphalt area?
22    A    Correct.
23    Q    All right.  What else did you do?
24    A    After that, then I would have kind of just
25 documented the situation and made notes of what was
00047
1 going on.
2     Q    Okay.  Did Ms. Dishion, did she ask you to
3 photograph the incident?
4     A    Yes.
5     Q    And when did you do that?
6     A    I did that the same day, that afternoon.
7     Q    The same day?  Okay.  And tell me what kind
8 of device you used to photograph it with.
9     A    I used my iPhone.
10    Q    Your iPhone?
11    A    Yes.
12    Q    Okay.  And so we've heard this term
13 "metadata."  Do you know what that is?
14    A    I'm not familiar.
15    Q    iPhones, as typical, will take a
16 photograph, and when it does that it records the GPS
17 location, if you have that turned on, and it will
18 record the time and date that you did that.
19    A    Okay.
20    Q    So the photographs that you took that day
21 have that kind of data attached to it, correct?
22    A    I would believe so, yeah.
23    Q    Do you still have those photographs?
24    A    Not on my iPhone, no.
25    Q    Did you sync those photographs up with your
00048

1  computer, or anything like that?  Did you email them
2  to anybody?
3     A   I would have emailed them from my phone to
4  my computer.
5     Q   And who would that have been?  Oh, to your
6  computer?
7     A   Correct, yeah.
8     Q   Okay.  And so the photographs that we have,
9  in terms of some of the -- Let's go ahead and mark
10  that.
11        (Exhibit No. 1 was marked.)
12  BY MR. PRICE:
13     Q   I'm going to show you what's marked as
14  Deposition Exhibit No. 1.  Did you take that picture?
15     A   Yes, I did.
16     Q   All right.  And so your recollection is
17  that picture was taken after the incident on the day
18  of it?
19     A   Correct.
20     Q   All right.  Is it possible that this could
21  have been taken the next day?
22     A   I don't think so.
23     Q   Okay.  And then you would have sent this
24  picture, or would you have just kept it on your
25  computer?  What would you have done with it?
   00049
1     A   I would have sent that to Ms. Brigham,
2  here.
3     Q   Who?
4     A   Susan Brigham.
5     Q   And when would you have done that?
6     A   I would have done that that day.
7     Q   Okay.  And is she one of your contact
8  people with Windtree, or what's your relationship
9  with her?
10     A   She's with our Risk Management Department,
11  so she would assist in any situations like this.
12     Q   Does she work for Weidner Investments?
13     A   I'm not sure specifically who she works
14  for, but yes, I think so.
15     Q   She's one of the people that you're told
16  you need to report to?
17     A   Yes.
18     Q   And so you would have mailed that to her
19  that same day?
20     A   I would have emailed that to her.
21     Q   Okay.  And so when I look at Deposition
22  Exhibit 1, I'm going to draw your attention to a
23  couple things in there.
24        First of all, I'm going to draw your
25  attention to this sign here.  What is that sign?  And
   00050
1  I'm pointing to a sign that says "Freeze," is what I
2  can see, and it's next to a stop sign.

3        Are you familiar with that?
4    A   Yes.
5    Q   And what is it?
6    A   It's a freeze warning sign, so this is
7  specifically for in regard to the interior of the
8  apartment home.  So if we have below freezing
9  temperatures, we don't want our pipes to freeze, so
10  we want residents not to turn off their heat or to
11  keep the water running slightly to ensure that we
12  don't have any broken pipes.
13    Q   Got you.  All right.  And then what I also
14  see in this picture, and I'm going to draw your
15  attention to, maybe you can see it somewhere up --
16  It's right in here.  There's a bucket.  Can you see
17  that?
18    A   Yes, I do.
19    Q   And what is that bucket there for?
20    A   I do not know.
21    Q   Okay.  I'm going to go ahead and take a
22  break here for a second and mark this as Deposition
23  Exhibit 2.
24        (Exhibit No. 2 was marked.)
25
 00051
1  BY MR. PRICE:
2    Q   And with regard to this picture, would you
3  agree this is also a picture that you took?
4    A   Yes.
5    Q   All right.  And once again, it's on the
6  same day that you believe to have been the date of
7  the incident; is that right?
8    A   Yes.
9    Q   And is there a bucket that you can now see
10  in that photograph?
11    A   Yes.
12    Q   And what is that, if you know?
13    A   I do not know.
14    Q   Okay.  Fair enough.
15        MR. PRICE:  Can we mark this as Deposition
16  Exhibit 3.
17        (Exhibit No. 3 was marked.)
18  BY MR. PRICE:
19    Q   Once again, I'm looking at Deposition
20  Exhibit No. 3.  Would you agree this is a picture
21  that you took on that day?
22    A   Yes.
23    Q   And give us an idea what direction we're
24  looking.
25    A   So we are looking east, at this point.
 00052
1    Q   All right.  And visible in that is some of
2  the ice and slushy conditions present; is that
3  correct?
4    A   Yes.

5     Q    And is this the general area in which Mr.
6  Doornbos was located when you saw him?
7     A    Yes.
8     Q    All right.  And is it possible that that
9  bucket is an Ice Melt bucket?
10    A    That's a possibility, but I'm not sure.
11    Q    All right.  It would be unusual for that
12  bucket to be out there; is that correct?
13    A    Correct.
14    Q    Okay.  I'll see if I've got pictures of
15  this.
16         MR. PRICE:  Can we mark this as 4.
17         (Exhibit No. 4 was marked.)
18  BY MR. PRICE:
19    Q    I hand you Deposition Exhibit No. 4 and ask
20  if you can kind of put No. 4 along together with the
21  other three exhibits and see if you see that bucket
22  in Exhibit No. 4.
23    A    I do not see the bucket, no.
24    Q    Okay.  So at some point, the bucket is
25  gone; is that correct?
   00053
1     A    That's what it appears to be, yes.
2     Q    All right.  It would be unusual to have a
3  bucket blocking a parking spot, especially one that's
4  a covered lot, correct?
5     A    Correct.
6     Q    Covered lots are for reserved spots for
7  residents?
8     A    Correct.
9     Q    All right.  We've been at it for about an
10  hour.  Would you like to take a break for a second?
11    A    I'm okay.
12    Q    All right.  So the freeze warning sign,
13  when does that go up?
14    A    That goes up when we have temperatures drop
15  below freezing.  Sometimes we'll leave it up longer.
16  But we want to make sure it's out for sure when
17  temperatures are below freezing.
18    Q    And so in terms of that, would it be common
19  that it goes out, say, in late October, November, and
20  just stays out for the entire winter?
21    A    A lot of times that can be the case, yes.
22    Q    Do you ever have people -- when I say
23  "people," residents -- at Windtree Apartments, back
24  in December of 2015, did any of them ever complain
25  about particular areas where there was ice or snow?
   00054
1     A    Not that I remember specifically, no.
2     Q    All right.  If someone did complain about
3  that, would it be written up as an incident report?
4     A    Most likely, yes.
5     Q    And any of those incident reports for
6  December of 2015, would those records still be

7  available?
8      A   I believe so.
9      Q   All right.  Would you have any problem
10  turning those records over, if they did exist?
11     A   No.
12     Q   With regard to -- I'm going to strike
13  that.
14         MR. BAKKEN:  Could we go off the record for
15  a minute?
16         MR. PRICE:  Sure.
17         (A break was held from 10:05 to 10:11.)
18  BY MR. PRICE:
19     Q   So the incident report that you generated,
20  that Ms. Dishion generated, we have copies of those;
21  you've given those to Counsel, correct?
22     A   I'm not sure what was given.
23     Q   Okay.  What did you turn over, in terms of
24  this case, regarding the incident that occurred on
25  December 18th, 2015?
  00055
1      A   I did not, myself, give anything over.
2      Q   Okay.  To the best of your knowledge, what
3  did you generate on that day?
4      A   So on that day, I would have created a
5  report just to explain what was going on, and time
6  and location of the incident, as well as pictures.
7      Q   You would have confirmed that this calendar
8  was appropriate; is that right?
9      A   Correct, yes, I would have put that -- I
10  would have sent that, as well.
11     Q   And this calendar appears to have gone
12  through the 19th; is that right?
13     A   That's what it looked like, yes.
14     Q   All right.  And then did you generate
15  emails out of this?
16     A   I don't recall.
17     Q   Okay.  You generated an internal report; is
18  that right?
19     A   Correct.
20     Q   All right.  And to refresh your
21  recollection, is this the copy of the report that you
22  turned over?
23     A   Yes.
24     Q   Okay.  And then to refresh your
25  recollection also, this appears to be a copy of an
  00056
1  email that you sent to Susan Brigham on December
2  21st; is that correct?
3      A   Yes.
4      Q   Okay.  And that's the same individual
5  that's sitting here during the deposition, correct?
6      A   Correct.
7      Q   All right.  And once again, why did you
8  generate that email to her?

9     A   If we have something that occurs on-site,
10  we complete this report and send it to our Risk
11  Management Department.
12     Q   So you did that approximately three days
13  later?
14     A   I don't know what time I did this.
15     Q   I draw your attention to the email, and it
16  says Monday, December 21st, at 9:48 a.m.
17     A   So the original email, I would have sent
18  this on Friday, December 18th.
19     Q   Okay.  So the day of and what time?
20     A   On this email, it says 4:48 p.m.
21     Q   Okay.  Thank you.
22         Did you receive any type of response back
23  from your email to Ms. Brigham?
24     A   On that document, it shows that she had
25  reached out to Terry Duffy, and then she had also
   00057
1   sent them flowers.
2      Q   Okay.  But did you receive a response back
3   from Susan Brigham on that day?
4      A   I don't recall.
5      Q   Okay.  Did you receive a telephone call
6   from her on that day?
7      A   I don't recall.
8      Q   All right.  Did anyone tell you to go out
9   and take the photographs or was that just part of
10  your responsibilities?
11     A   That's part of my responsibilities.
12     Q   Is it detailed, in terms of any of your
13  manuals, that's what you're supposed to do on a slip
14  and fall?
15     A   I'm not sure.
16     Q   Okay.  With regard to any kind of injury
17  type of incident that occurs on your properties,
18  what's your policy and procedure for that?
19     A   For any type of injury?
20     Q   Yes.
21     A   So for any type of injury, we would
22  complete our internal incident report and then send
23  that to our Risk Management Department.
24     Q   Okay.  Is it part of your policy and
25  procedure manual to go out and take photographs of
   00058
1   where the incident occurred?
2      A   I'm not sure if it's part of our policies
3   and procedures, but that's what -- anytime there's an
4   incident, that's what I would do.
5      Q   Had you had any kind of slip and falls
6   prior to this while you were working there that
7   winter?
8      A   I don't know specifically of the time.  I
9   do recall there were other incidents at my time at
10  Windtree.

11   Q   Okay.  So we're talking from 2000 and, when
12 did you start, '14?
13   A   Correct.
14   Q   Till up until this time, there's been prior
15 incidents of people slipping and falling?
16   A   Correct.
17   Q   Okay.  Was that due to snow and ice?
18   A   From -- No.
19   Q   Just what was it due to, in your
20 recollection?
21   A   So the two that I recall, one of them was a
22 resident was walking upstairs and slipped, and then I
23 guess the second one was due to ice.  They slipped on
24 the stairs coming down from their apartment.
25   Q   All right.  Was there any kind of remedial
 00059
 1 measures that were taken after this incident?  Do you
 2 know what I mean by that?
 3   A   I do not.
 4   Q   Did you guys do anything different, in
 5 terms of the parking lots, after this incident
 6 occurred?
 7   A   Like I said before, we put down some Ice
 8 Melt in that location, but I don't recall doing
 9 anything differently.
10   Q   Somebody directed Mr. Punzal to go out and
11 start chipping away ice in the parking lot, correct?
12   A   I don't recall.  I just remember them
13 having put Ice Melt out there.
14   Q   But your recollection, with regard to the
15 photograph of seeing him out with a snow shovel in
16 the parking lot, you do recall seeing that
17 photograph?
18   A   Yes.
19   Q   And we do agree it's him and we do agree
20 it's after this incident?
21   A   I just don't know when that specifically
22 occurred.
23   Q   Okay.  I'm almost done.
24      The only thing I would do at this point is
25 we're going to be getting a copy of your --
 00060
 1      MR. BAKKEN:  I emailed that to you.
 2      MR. PRICE:  And I'll go through that, and I
 3 would reserve just another line of questioning if it
 4 arises out of that.
 5      Okay, I'm done.  Do you have any
 6 questions?
 7      MR. BAKKEN:  I do not.
 8
 9      ...Thereupon, at 10:19 a.m., the taking of
10 the witness' testimony was concluded...
11
12

13
14
15
16
17
18
19
20
21
22
23
24
25
00061
1         CERTIFICATE OF WITNESS
2  STATE OF COLORADO )
            ) ss:
3  COUNTY OF EL PASO )
4
      I, Michael Malone, a witness in the above
5  deposition, do hereby acknowledge that I have read
   the foregoing transcript of my testimony, and state
6  under oath that it, together with any attached
   amendment to the deposition, constitutes my sworn
7  testimony.
8      I have ( ) have not ( ) made corrections on
   the attached amendment to the deposition form.
9
10     _____
          Michael Malone
11
12    Subscribed and sworn to before me this
13 _____ day of _____, 2018.
14
15     _____
          Notary Public
16        State of Colorado
17    Address: _____
18        _____
19        _____
20
      Commission: _____
21
22
23
24
25
00062
1      CERTIFICATION OF COURT REPORTER
2
   STATE OF COLORADO )
3          ) ss:
   COUNTY OF EL PASO )
4

5       I, Annette R. Trefz, RPR and Notary Public
within and for the State of Colorado, contracted to
6   take the deposition of Michael Malone, do certify
that before the deposition the witness was duly sworn
7   by me to testify to the truth; that the said
deposition was taken by me at 9:04 a.m., on June 6,
8   2018; then reduced to typewritten form consisting of
62 pages herein; that the foregoing is a true
9   transcript of the questions asked, testimony given,
and proceedings had.
10
        I further certify that I am not related to  any
11  party herein or their Counsel, and have no interest
in the result of this litigation.
12
        IN WITNESS WHEREOF, I have affixed my
13  signature this 16th day of June, 2018.
14
15
16       _____
        Annette R. Trefz
17        RPR and Notary Public
Within and for the
18        State of Colorado
19        My Commission Expires: 2-1-22
20
21
22
23
24
25